## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

IN RE:     **PANTHER MOUNTAIN LAND**       **4:09-bk-16836**
               **DEVELOPMENT, LLC, Debtor**       **Chapter 11**

## MEMORANDUM OPINION AND ORDER
## DENYING MOTION FOR RELIEF FROM STAY AND
## DENYING MOTION FOR VALUATION OF SECURED CLAIMS

Now before the Court are the *Motion for Relief from Stay* ("**Motion for Relief**") (docket #81) and *Motion Setting Property Value for Valuation of Secured Claims* ("**Motion for Valuation**") (docket #83) filed on behalf of National Bank of Arkansas ("**National Bank**" or "**Creditor**"). The Court heard arguments and received evidence on these matters during hearings conducted on August 4, 2010, August 20, 2010, and August 23, 2010. Making appearances before the Court were attorneys Richard L. Ramsay and James H. Penick, of the firm Eichenbaum, Liles & Heister, as counsel for the Debtor, and Stephen L. Gershner and Charles Davidson, of the Davidson Law Firm, as counsel for National Bank.

At the close of evidence on August 23, 2010, the Court took these matters under advisement. Contemporaneously, the Court granted a request allowing the parties to submit post-trial briefs on two limited issues.[1] Both parties timely submitted post-trial briefs.

---

[1] In closing arguments, counsel for National Bank presented the Court with authority on two points of law. The first was whether a minimum equity cushion is required in order to substantiate a claim of adequate protection. The second concerned the rate at which interest accrues on a claim after filing. Because these issues were raised for the first time in closing arguments, counsel for the Debtor requested an opportunity to present post-trial briefs. That request was granted as provided for in the *Scheduling Order* (docket #122) of August 26, 2010.

Following a thorough review of the record and all arguments presented, and for the reasons explained in this Order, both the Motion for Relief and Motion for Valuation are denied. The Court has subject matter jurisdiction over these proceeding pursuant to 28 U.S.C. § 1334(b). These matters are core proceedings under 28 U.S.C. §§ 157(b)(2)(G), (K) and, therefore, this Court has authority to enter a final order on these matters.

## PROCEDURAL BACKGROUND

On September 20, 2009, the Debtor filed for protection under Chapter 11 of the United States Bankruptcy Code. On September 21, 2009, one day after the bankruptcy case was filed, National Bank filed its first *Motion for Relief from Stay* ("**First Motion for Relief**") (docket #3). In its motion, National Bank requested relief from the stay with regard to two separate properties: Sunset Lake Estates ("**Sunset Lake**") and Panther Mountain Estates ("**Panther Mountain**"). The Court held an evidentiary hearing on that motion November 17, 2009, which was continued on December 2, 2009. At the conclusion of the hearing, the Court denied the motion from the bench.[2] On December 8, 2009, the Court entered an order reflecting its decision (docket #28). A short time later, December 16, 2009, the Debtor filed its Chapter 11 Small Business Plan (docket #33).

_____

[2] In announcing its decision, the Court found the appraisal report and expert testimony provided by National Bank on the value of the property to be unreliable and unpersuasive. Additionally, the Court found the testimony presented by the Debtor as credible, which compelled the Court to find that there was equity in the property and that the equity cushion was sufficient to adequately protect National Bank's interests.

On April 26, 2010, within five months of the Court's denial of the First Motion for Relief, National Bank filed a second Motion for Relief (docket #81). On that same day, National Bank filed its Motion for Valuation (docket #83). Those two motions were heard simultaneously in hearings conducted on August 4, 2010, August 20, 2010, and August 23, 2010. At the conclusion of the August 23, 2010 evidentiary hearing, the Court took those matters under advisement and both are resolved herein.

Also on August 23, 2010, prior to the conclusion of the evidentiary hearing on the present Motion for Relief and Motion for Valuation, National Bank filed a third *Motion for Relief from Stay of Single Asset Real Estate* (docket #114) ("**Third Motion for Relief**"). In that motion, National Bank once again requests relief from the automatic stay with regard to the Sunset Lake and Panther Mountain properties. On September 23, 2010, while the decision on the current motion was under advisement and the Third Motion for Relief had yet to be heard, National Bank filed a fourth *Motion for Relief from Automatic Stay* ("**Fourth Motion for Relief**") (docket #143). The two most recent requests for relief are set for hearing on October 28, 2010.

### FACTS

A.   THE DEBTOR

1.      The Debtor, Panther Mountain Land Development, L.L.C. ("**Debtor**"), is an entity formed for the purpose of managing the development of two tracts of real estate. The business owners are Ms. Dana M. Kellerman and Mr. Barry K. Kellerman, with Ms.

3

Kellerman being the primary business manager.

2.       In addition to her experience as the business manager of the Debtor entity, Ms. Kellerman has been employed as a real estate agent for Rausch Coleman since November of 2009. Meanwhile, Mr. Kellerman has gained experience with property development through his previous employment with the Country Club of Arkansas.[3]

3.       Mr. Kellerman and Ms. Kellerman have both lived in the City of Maumelle, Arkansas, for the last 24 years.

B.       THE SUBJECT PROPERTIES

4.       The two properties owned and managed by the Debtor are located in Maumelle, Arkansas. Sunset Lake is an approximately 126 acre tract of land. This property is currently held in the form of vacant, undeveloped acreage and is zoned for both residential and commercial use.

5.       The Debtor is currently bound under a Real Estate Purchase Agreement (Debtor Exhibit #7) to sell 45 acres of the Sunset Lake property to ERC Land Development Group, L.L.C. The purchase price of the acreage property is $600,000.00, which equates to

---

[3]  The Country Club of Arkansas was referred to in a general manner throughout the evidentiary hearings. The Court understood that these references were to a real estate and housing development company in Maumelle, and not as direct references to any related membership organization.

approximately $13,333.00 per acre.[4]

6.     The second property, Panther Mountain, is an approximately 79 acre tract of land.  This property is held in the form of a developed subdivision, consisting of a total of 25 residential lots and an approximately 15 acre tract of undeveloped land.

7.     The lots in the Panther Mountain subdivision vary greatly in size.  The smallest lot measures just more than one acre, while the largest lot in the subdivision covers more than 11.5 acres.[5]  Taking all 25 lots into account, the average lot size would total more than two acres per lot.

8.     The Debtor had sold eight of the original 25 lots prior to filing this bankruptcy case.[6]  A total of 17 lots and the connected 15 acre undeveloped tract remain as property of the estate.  The average lot size of the remaining 17 lots is slightly less than two acres per lot.

---

[4]  One of the provisions in this contract allows the purchaser to withdraw from the agreement for a period of 90 days.  During the hearing, National Bank objected that this provision made the agreement irrelevant.  Based on the Debtor's testimony that such provisions are common in development property sales contracts, the Court overruled the objection.

[5]  The precise size of each lot is as follows: Lot #1: 1.41 acres;  Lot #2: 1.40 acres;  Lot #3: 2.05 acres;  Lot #4: 1.56 acres;  Lot #5: 1.68 acres;  Lot #6: 1.07 acres;  Lot #7: 1.10 acres;  Lot #8: 2.7 acres;  Lot #9: 2.32 acres;  Lot #10: 2.29 acres;  Lot #11: 1.37 acres;  Lot #12: 1.10 acres;  Lot #13: 1.07 acres;  Lot #14: 1.07 acres;  Lot #15: 2.77 acres;  Lot #16: 2.38 acres;  Lot #17: 4.23 acres;  Lot #18: 1.56 acres;  Lot #19: 1.25 acres;  Lot #20:1.82 acres;  Lot #21: 2.10 acres;  Lot #22: 3.22 acres;  Lot # 23: 11.51 acres;  Lot # 24: 2.89 acres;  Lot #25: 2.02 acres.

[6]  Lot #18 sold on August 6, 2007, for $62,000.00;  Lot #15 sold on August 28, 2007, for $64,000.00;  Lot #5 acres sold on September 21, 2007, for $63,000.00;  Lot #19 sold on October 9, 2007, for $63,000.00;  Lot #23 sold on October 12, 2007, for $78,000.00;  Lot #2 sold on January 2, 2008, for $63,000.00;  Lot #17 sold on August 6, 2008, at an amount not disclosed to the Court; and Lot #14 sold on July 10, 2009, for $52,000.00.

No sales have taken place since the filing of the case.

9.      Panther Mountain and Sunset Lake are both currently listed for sale with real estate agent Gayle Odom, an executive broker of Crye-Lieke Realty.  The acreage property, Sunset Lake, has been listed with Ms. Odom since July of 2009. The Panther Mountain subdivision has been listed since March of 2008, but Ms. Odom did not get the listing until April of 2010.  Ms. Odom has been a real estate agent working in the Maumelle area for more than 30 years, during which time she has had experience selling both development and construction properties.

C.      THE DEBT

10.     National Bank is the holder of two claims against the Debtor's estate that arise out of two separate notes made payable to it by the Debtor.

11.     The first note, Loan #4118449, was originated on April 27, 2007.   The principal amount of this obligation was $930,000.00, with interest accruing at a rate of 8.75%.  The note was originally set to mature on a one-year term ending on April 27, 2008, but was renewed by the Debtor for one additional year prior to that date.  The payment terms included monthly interest payments with the balance due at maturity.  This note was secured by a mortgage on the property known as Sunset Lake.  The mortgage was filed and recorded in Pulaski County on May 3, 2007.

12.     The second note, Loan #4119233, was originated on July 27, 2007, in the

6

principal amount of $858,000.00, with interest accruing at a rate of 8.75%. This note had an original term of one year, set to mature on July 27, 2008. The payment terms were for monthly interest payments with the balance due at maturity. This note was secured by a mortgage on the property known as Panther Mountain. This mortgage was filed and recorded in Pulaski County on July 31, 2007. The Debtor renewed the obligation on this note on August 24, 2007, which increased the obligation amount to $975,000.00.

13.     A foreclosure action on both of the subject properties was filed by National Bank on November 4, 2008, in the Circuit Court of Pulaski County, State of Arkansas. As grounds for default, the foreclosure petition stated that the Debtor had failed to make payments as required (Creditor Exhibit #12).

14.     At the time of the filing of this bankruptcy case, the Debtor owed $1,206,736.65 on the loan secured by the Sunset Lake property (Creditor Exhibit #10) and $689,442.11 on the loan secured by the Panther Mountain property (Creditor Exhibit #11). The last payment to National Bank was made on July 17, 2009, following the sale of Lot #14 of the Panther Mountain subdivision for $52,000.00.

D.      THE APPRAISAL REPORTS

15.     The core of National Bank's evidence on the value of the property was presented in the form of professional appraisals. The appraisals valued the properties as of the date of January 15, 2010, and each is described below.

### *The Sunset Lake Appraisal (The 126 acres)*

The appraisal of the Sunset Lake acreage property valued the property at $1,134,000.00.  The method used to determine this value was a sales comparison approach, in which Sunset Lake – the 126 acre property – was compared to other multi-acre tract property sales in order to estimate a value.

The appraisal compared the Sunset Lake acreage property to four property sales.  The first, Sales Comparison #1, was the sales transaction in which the subject property, Panther Mountain Estates, was sold to the Debtor.  This sale took place on May 3, 2007, and was purchased by the Debtor at that time for a price of $9,857.00 per acre.  The second comparison property, Sales Comparison #2, was a 2005 sale of an 80 acre tract of land to Barry K. Kellerman, one of the two owners of the Debtor entity.  This property sold at that time for $3,500.00 per acre.  Sales Comparison #3 was a 2006 property sale of an approximately 10 acre tract of land for $13,611.00 per acre.  Sales Comparison #4 was a 2009 property sale of a 38 acre tract in the amount of $14,387.00 per acre.

After selecting the comparison properties, the appraiser adjusted the sales price of each comparison to account for the time, location, and size differences between that comparison property and the subject property.  The appraiser made no adjustments to Sales Comparison #1.  The appraiser increased Sales Comparison #2 by 31% from $3,500.00 per acre to $4,638.00 per acre; decreased the sales price of Sales Comparison #3 by 43% from $13,611.00 per acre to $7,282.00 per acre; and decreased the sales price of Sales Comparison

8

#4 by 45% from $14,387.00 per acre to $7,913.00 per acre.

Following the price adjustments, each sales comparison was assigned a weighted percentage, which anchored the final value to the significance the appraiser placed on each sales comparison. Sales Comparison #1 was assigned 70% of the weight of the final value calculation. Each of the other three sales comparisons – Sales Comparison #2, Sales Comparison #3, and Sales Comparison #4 – were assigned only 10% of the weight for the final value calculation.

### The Panther Mountain Appraisal (The Lots)

With regard to the 17 unsold lots in the Panther Mountain subdivision, National Bank's appraisal found the value to be $480,000.00. This appraisal used the income capitalization approach. Mr. McIntosh testified that he used this method because there were no similar properties available for comparison under the sales comparison approach.

The first step of the income capitalization approach requires that the appraiser determine a value for the lots. In this determination, the appraiser attempts to arrive at one value that is a fair representation of the individual lot values. In this case, the appraiser arrived at a value of $56,500.00 per lot. The appraisal report details that this value was reached by, first, averaging together six of the eight prior lot sales, and second, averaging the result from the first figure with the most recent lot sale of Lot #14.

In the second step of the income capitalization approach, a prediction is made as to

how long it will take for the properties to sell, and then the property sales are allotted throughout that time period.  In this case, the sales were predicted over a four-year period. According to the appraisal, at the end of the four-year period the Debtor would have received a gross revenue amount of $991,315.00 from the sale of the lots.  This gross revenue amount is then reduced by the anticipated costs and expenses associated with selling the lots.  That reduction leaves the Debtor with a net revenue of $895,750.00.

The net revenue is then reduced by a discounted cash flow measure, which increases cumulatively each year.  In this case, the appraisal forecasts that two lots will sell in Year #1, three lots will sell in Year #2, six lots will sell in Year #3, and six lots will sell in Year #4. As a result of the cumulative calculation, the discount rate increased from approximately 20% in Year #1 to nearly 58% in Year #4.  Accordingly, due to the discounted cash flow measure, the net revenue amount was reduced by an additional $415,250.00.  After all of the deductions, the original $991,315.00 gross revenue amount was reduced to a value of $480,500.00.

E.    THE HEARING TESTIMONY AND NON-APPRAISAL EXHIBITS

16.    The appraiser, Mr. B. A. McIntosh, testified as an expert for National Bank at the hearing.  Mr. McIntosh has been a licensed real estate appraiser for a period of 17 years. During the last 10 years, Mr. McIntosh has worked as an independent commercial appraiser. Prior to that, he was employed for a span of 20 years as the Pulaski County Assessor.

17.    In regard to the adjustment to Sales Comparison #1 in the Sunset Lake

10

appraisal, Mr. McIntosh testified that no adjustment was made because it was the same property as the subject property.  Further, on cross-examination, Mr. McIntosh confirmed that the adjustments he made to the prices of the other sales comparisons were completely subjective.  Additionally, a clause in the appraisal report (Creditor Exhibit 15) states that "although we feel that our adjustments are accurate and representative of the market, no match pair sales were available to accurately quantify the location adjustments or the market condition adjustments we made."

18.     Mr. McIntosh testified that his valuation of the Sunset Lake property was based on the premise that the entire 126 acres would be sold in one bulk transaction.  Mr. McIntosh explained that reductions to the sales comparison prices were necessary to equate for the differences in size because larger parcels sell for less per square foot than smaller parcels.  Ms. Kellerman, on the other hand, pointed out that the property is not being marketed as a singular 126 acre tract, but instead as smaller acreage allotments.  Further, Ms. Kellerman stated that this is a common practice in the sale of development properties and that no further subdivision approvals would be required to sell the property in this manner.

19.     In explaining how he arrived at the value amount for the first step of the income capitalization approach on the Panther Mountain lots, Mr. McIntosh testified that he derived this value by averaging together two of the three most recent lot sales.

20.     The Panther Mountain appraisal failed to take into account the 15 acre tract of undeveloped land that is a part of the Panther Mountain subdivision.  When asked on cross-

11

examination why this portion of the property was not included, the appraiser testified that he thought it to be insignificant and worth no more than $1,000.00 per acre.

21.     Dana Kellerman and Gayle Odom both testified as witnesses for the Debtor.

22.     Ms. Kellerman testified that she believed the value of the Panther Mountain subdivision lots to be, at a minimum, $50,000.00 per lot.  As for the Sunset Lake property, she stated that she would estimate the market value to be approximately $15,000.00 per acre, after taking into account the Debtor's need to sell the property.  Ms. Kellerman stated that she based these valuations on the spacious size of the lots and her personal experience with selling the properties, which made her uniquely aware of the level of interest in the properties.

23.     Ms. Odom testified that the Panther Mountain lots would likely sell in the range of $50,000.00 to $60,000.00, depending on their individual variations in size.  Ms. Odom stated that she believed the value of the Sunset Lake acreage property to be approximately $15,000.00 per acre.

24.     In response to National Bank's appraisal report on the Sunset Lake property, Ms. Odom testified that there were property sales available for comparison that were more similar to the subject property than those used in the appraisal report.  The Debtor presented an exhibit providing the details of each of these alternative comparisons.  The first was a

12

2006 sale of an 80 acre tract of land for $50,000.00 per acre (Debtor Exhibit #9).[7] Ms. Odom testified that this property was similar to Sunset Lake in both terrain and its intended use. Ms. Odom also testified about a 2006 sale of a 40 acre tract of land that sold for $18,350.00 per acre. This tract of land was purchased for the purpose of rural development and was the same distance from the City of Maumelle as the subject property (Debtor Exhibit #10). Additionally, the three other property sales included a 1997 sale of a 27 acre tract for $14,700.00 per acre, which is now being marketed at $92,000.00 per acre (Debtor Exhibit #11); a 2004 sale of a 53 acre tract, within one mile of the subject property, that sold for $14,150.00 per acre (Debtor Exhibit #13); and a 2004 sale of a 20 acre tract that sold for $37,500.00 per acre (Debtor Exhibit #14).[8]

25.     Ms. Odom testified that the Maumelle area has continued to grow throughout the recent years of economic downturn. Both Ms. Kellerman and Ms. Odom testified that the new 65 million dollar school and three million dollar police station and fire station being built in the area will likely increase interest in the area. Further, Ms. Odom testified that the purchase agreement on the 40 acres of the Sunset Lake property would likely increase interest in the remaining acreage.

---

[7]  National Bank objected to the introduction of this comparison on the basis of relevance, stating that the sale was too old. The appraisal presented by National Bank, however, used an 80 acre comparison property that was sold in 2005. The Court overruled this objection.

[8]  The Debtor also included a 2009 property sale of a 38 acre tract for $14,400.00 per acre (Debtor Exhibit 12), but this sale was included in National Bank's appraisal.

26.     B.A. McIntosh, Dana Kellerman, and Gayle Odom all acknowledged, although to differing degrees, that the rate of sale of the Panther Mountain lots has declined in recent years because of a general downturn in economic conditions.  However, Ms. Kellerman and Ms. Odom both qualified their statements, attributing part of the decline to a reduction in Ms. Odom's availability.  Ms. Odom testified that her opportunity to market the properties had declined due to the recent health complications of several family members.  Furthermore, Ms. Odom testified that she has recently started an aggressive marketing campaign, consisting of printed materials, emails to registered builders in the area, and a mailing campaign.  Ms. Odom stated that this campaign was producing interest in both the Panther Mountain and Sunset Lake properties.  In support of this contention, Ms. Odom stated that she had been contacted by and was talking with six different purchasers about buying lots in Panther Mountain.

27.     As additional evidence of the value of the Panther Mountain lots, National Bank offered into evidence a newspaper advertisement, which listed lots for sale in the Maumelle area for $24,900.00 (Creditor Exhibit #20).  The properties listed for sale in the advertisement were one-half acre lots.  Gayle Odom testified that she did not believe the advertised lots made good comparisons because there was a significant size differences between the lots offered and the Panther Mountain lots.

28.     The Debtor presented four exhibits to show that there was equity in the property.  The exhibits represented that at the end of a one or two-year period the property

14

values would remain in excess of the debt amount (Debtor Exhibits #1-4).  In response, National Bank submitted its calculations for the same time periods.  National Bank's calculations, however, reached the opposite conclusion – that there would be no equity in the properties (Creditor Exhibits #21-22).  To allow for these conflicting results, the parties' calculations differed in the rate of interest,[9] the amounts taken out for real estate commissions,[10] the amount taken out to fund the Debtor's plan,[11] and the date on which the property sales will take place.

29.    At the hearing, the Debtor submitted into evidence a proposed First Amended Plan of Reorganization.  This plan had not been filed with the Court.  The proposed plan called for the Debtor to retain a percentage of proceeds from the sale of the properties in order to fund the plan.  As a protective measure, however, the plan placed a two-year deadline on the time the Debtor had to make the sales.  Accordingly, if the properties were not sold within that time, the properties would be sold at an auction.

---

[9]  The Debtor used an interest rate of 5%.  National Bank used the contract rate of 8.75%.

[10]  The Debtor did not subtract a real estate commission amount in their calculation, while National Bank reduced the amount by 10% to account for the real estate commission.

[11]  The Debtor did not subtract any amount from the sale of the properties to fund the plan.  National Bank did one calculation where the value was reduced by this plan payment amount and one calculation where it was not.

15

## DISCUSSION

On April 26, 2010, National Bank moved this Court to grant it relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2). The foundation for this motion was that the collateral of National Bank's secured claims lacked equity and was not necessary for an effective reorganization. National Bank did not request relief from the automatic stay "for cause" pursuant to 11 U.S.C. § 362(d)(1) in the motion it filed with the Court; however, arguments on those grounds were made, and defended against, at the hearing and in the subsequent post-trial briefs. As a result, the Court accepted National Bank's arguments on lack of adequate protection as an oral request for relief for cause under § 362(d)(1). Additionally, National Bank filed a Motion for Valuation pursuant to Fed. R. Bankr. P. 3012, which is also before the Court at this time. The Court denies the Motion for Relief and Motion for Valuation, as explained below.

## I.    RELIEF FROM STAY PURSUANT TO 11 U.S.C. § 362(d)(2).

### A.    *Burden of Proof*

Relief from stay under 11 U.S.C. § 362(d)(2) is a two-part test, consisting of evidence that the debtor does not have equity in the property and that the property is not necessary for the debtor to effectively reorganize its debts. 11 U.S.C. § 362(d)(2). The burden of proof to establish that there is a lack of equity in the property is placed on the party seeking relief. 11 U.S.C. § 362(g). This burden consists of not only the burden of production, but also the ultimate burden of persuasion. *In re Joyner*, 416 B.R. 190, 192 n.1 (Bankr. M.D.N.C. 2009);

16

*In re Busch*, 294 B.R. 137, 140-41 (B.A.P. 10th Cir. 2003); *In re Ealy*, 392 B.R. 408, 414 (Bankr. E.D. Ark. 2008). In order to meet this burden, the creditor must show that there is a lack of equity by a preponderance of the evidence. *In re Foxcroft Square Co.*, 184 B.R. 671, 678 (E.D. Pa. 1995). Where the parties present an equal balance of evidence, the creditor has not met its burden. *Id.* If the burden of proof on the issue of equity is resolved in favor of the creditor, the burden shifts to the debtor to show that the property is necessary for an effective reorganization. § 362(g); *see also In re Dahlquist,* 34 B.R. 476, 481 (Bankr. D.S.D. 1983).

   B.    *Legal Standards*

   When a creditor requests relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2), the reviewing court must engage in a two-part analysis. The first prong of the analysis requires the court to determine whether any equity exists in the property held as collateral for the creditor's claim. § 362(d)(2)(A). Equity, for the purposes of obtaining relief under § 362(d)(2)(A), is the value of the collateralized property less all encumbrances on that property. *In re Bowman*, 253 B.R. 233, 238 (B.A.P. 8th Cir. 2000).

   If it is shown that there is a lack of equity in the property, the court must make a secondary determination of whether the property is necessary for an effective reorganization. § 362(d)(2)(B). To make this determination, the court must analyze the two intermingled concepts of necessity and effective reorganization. "Property is necessary for an effective reorganization 'whenever it is necessary[,] either in the operation of the business or in a plan,

17

to further the interests of the estate through rehabilitation or liquidation.'" *In re Keller*, 45 B.R. 469, 472 (Bankr. N.D. Iowa 1984) (*quoting In re Koopmans*, 22 B.R. 395, 407 (Bankr. Utah 1982)).  However, the necessity of the property is only important to the extent that it exists simultaneously with a reasonable possibility of reorganization. *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 375, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988) (describing the appropriate standard as that of a "reasonable possibility of successful reorganization within a reasonable time") (citation omitted); *In re Dublin Properties*, 12 B.R. 77, 80 (Bankr. Pa. 1981).

C.     *Analysis*

National Bank seeks relief from the automatic stay, pursuant to § 362(d)(2), on two properties that are the principal assets of the Debtor's estate, Sunset Lake and Panther Mountain.  In pursuit of this relief, National Bank hired a professional appraiser, B.A. McIntosh, to prepare appraisals on each of these properties.

Mr. McIntosh testified as an expert witness at the hearing.  In his testimony, he stated that he has been a licensed real estate appraiser for a period of 17 years.  During the last 10 years, Mr. McIntosh has worked as an independent commercial appraiser. Prior to that, he was employed for a span of 20 years as the Pulaski County Assessor.  Mr. McIntosh testified that he had conducted appraisals on a great number of properties and that his appraisals, including the ones at issue in this case, always comply with the Uniform Standards of Professional Appraisal Practice (USPAP).

18

Despite the apparent professional nature of these appraisals, and without in any manner calling into question the appraiser's compliance with legal standards, the Court cannot rely on the appraisals, or the testimony provided to explain them, as an accurate and reliable determination of value. Of specific consequence to the Court in making this decision were the inconsistencies observed in each valuation method, the highly subjective components controlling each calculation, and the stark absence of reasonably similar property comparisons. Taking these weaknesses into account, the Court was unable to accord persuasive weight to the appraisals and very little other evidence of value was presented by National Bank. Considering this lack of evidence together with the countervailing evidence offered by the Debtor, including a contractual offer on a large portion of the Sunset Lake acreage property, the Court finds that National Bank failed to prove a lack of equity in the properties. Owing to the distinct characteristics of each property and differing approaches utilized in valuing those properties, each is reviewed separately.[12]

### The Sunset Lake Estate (The 126 Acres)

As established by National Bank, the total amount owed on Sunset Lake at the time

---

[12] The Court finds that a detailed review of the basis for its decision will be beneficial to the parties and to judicial economy. This is National Bank's second request for relief from the automatic stay – the First Motion for Relief was filed on September 21, 2009 (docket #3). Although the current and prior motions were resolved entirely and solely on the evidence presented in the separate hearings on those matters, the exact same evidentiary deficiencies controlled the outcome on both occasions. Further, National Bank has filed two subsequent requests for relief from the automatic stay – the Third Motion for Relief was filed on August 23, 2010, *while* the present Motion for Relief was being heard (docket #114), and the Fourth Motion for Relief was filed on September 23, 2010 (docket #143).

19

of filing was $1,206,736.65 (Creditor Exhibit #10). The contract rate of interest is 8.75%, resulting in a daily accrual of interest in the amount of $226.04 (Creditor Exhibit #10).[13] Following these figures, the amount owed on the Sunset Lake debt at the time of the Motion for Relief hearing was approximately $1,281,870.27.[14] [15] Thus, the determination of equity turns on whether there was sufficient evidence presented to show that the value of the property was less than this amount.

National Bank's appraisal of the acreage property valued it at $1,134,000.00 using the sales comparison approach (Creditor Exhibit #15).[16] Under this approach, the appraiser reviews the sales records of similar properties in an attempt to estimate the market value of the subject property. In this instance, the appraisal calculation consisted of a comparison to four different property sales. Unfortunately, each of those sales comparisons was riddled

---

[13] The parties have submitted extensive post-trial briefs on the issue of the rate at which interest should accrue on these claims. That issue is discussed in greater detail within the Court's analysis of the request for relief made pursuant to § 362(d)(1). No such discussion is warranted at this juncture.

[14] The case was filed on September 20, 2009. The final hearing on this matter took place on August 23, 2010, which is 337 days after the date of filing. This results in $76,175.48 in additional post-petition interest when calculated at the contract interest rate. [$1,206,736.65 (Balance at Filing) + $76,175.48 ($226.04/Day for 337 Days) = $1,281,004.75].

[15] To the extent the Court's calculation of the outstanding obligation fails to account for any additional fees or other obligations incurred on this debt, the Court notes that the parties failed to provide this information in the record.

[16] The appraisal lists the value as $1,135,000.00 in some places and $1,134,000.00 in others. The Court elected to use the lower figure because it coincides with other amounts used in the value calculation. Nonetheless, the difference in the figures does not ultimately affect the Court's determination on this matter.

with puzzling deficiencies.

The first sales comparison (Sales Comparison #1) utilized by the appraisal was none other than the sale of the subject property – Sunset Lake – from when it was sold to its current owner, the Debtor, on May 3, 2007. In other words, the first comparison that the appraisal made was a comparison of the subject property to itself. There are several problems with this comparison. First, the appraiser placed 70% of the weight of his final value calculation on this particular comparison. In his testimony, the appraiser attempted to justify the significant weight he placed on this comparison by propounding that the sale was the same size and with the same demographics as the subject property. Of course this is correct; it was the exact same property. Nonetheless, it is odd and contradictory that the appraiser would rely so heavily on this particular sale. To do so requires a wholehearted acceptance of the value that the Debtor placed on this property at the time of purchase, only to use that value to discredit the Debtor's proposal of what the property is worth today.

Furthermore, the acreage property was sold to the Debtor at a price of $9,857.00 per acre, but the appraisal's calculation of value was based on a price of only $9,000.00 per acre. If Sales Comparison #1 had been the only comparable taken into consideration, the calculation would have yielded a value of $1,241,982.00, as opposed to the actual appraisal calculation of $1,134,000.00. This fact accentuates the curious result that the other sales comparisons work only to substantially reduce the appraisal value. Certainly the Court would take no issue with such a result so long as there was a justifiable reason for making the

21

comparisons.  However, if the appraiser's testimony that the comparison to the prior sale of the subject property is justified by the fact that it is like the subject property in every way is accepted as true, then the only plausible justification for considering other sales would be to account for an appreciation or decline in the market since that time.  Yet, only one of the three other sales comparisons, Sales Comparison #4, was sold at a later date than Sales Comparison #1.  Meanwhile, the other two sales comparisons, Sales Comparison #2 and Sales Comparison #3, were sold in 2005 and 2006.  While the consideration of a prior sale of the subject property may be appropriate for general property appraisal purposes, where such substantial weight is placed on that comparison, concerns arise as to the reliability of the resulting value.

The magnitude of the adjustments made to the sales comparisons also played a part in the Court's determination.  The third comparison property, Sales Comparison #3, was the sale of a 10 acre tract at a price of $13,611.00 per acre.  Based on the difference between the number of acres included in this sale and the number of acres in the subject property, the appraiser reduced the sales price by 50%.  Similarly, Sales Comparison #4 was reduced by 45%, which was attributed to a combination of the size and location of the property.  On cross-examination, Mr. McIntosh confirmed that these adjustments were completely subjective.  Further, the language in the appraisal report itself disclaims liability for the accuracy of these figures by stating that "[a]lthough we feel that our adjustments are accurate and representative of the market, no match pair sales were available to accurately quantify

22

the location adjustments or the market conditions adjustments we made."

Moreover, in making the decision to adjust the comparison prices based on size, the appraiser completely disregards the possibility that the subject property could sell in any smaller proportion than the entire 126 acres. In his testimony, the appraiser stated that the size adjustments were necessary because the price per acre on the sale of a small number of acres is greater than on the sale of a large number of acres. Mr. McIntosh testified that his adjustments to the comparison prices was based on this premise. Although Ms. Kellerman did not refute this general concept of acreage pricing, she did point out that the property is not being marketed as a singular 126 acre tract, but instead is being marketed for sale in smaller acreage allotments. Indeed, at the time of the hearing the Debtor was under a contract to sell a 40 acre portion of this property. Armed with these facts, Ms. Kellerman strongly refuted that Mr. McIntosh's appraisal was an accurate and appropriate means of determining the value of this property.

The extreme adjustments made in this appraisal furthered the Court's determination that the value presented by this appraisal is unreliable. Under normal circumstances, the Court would afford great weight to the opinion of the appraiser on such matters. Given the profound impact of the adjustments made in this particular appraisal, however, the Court required something more than the admittedly subjective estimation of the appraiser as a foundation for these extreme adjustments. To accept a valuation based on inconsistent and unreliable grounds would resign the Court to the position of an unthinking agent, blindly

accepting numbers placed before it simply because those numbers were presented by an expert.  Moreover, even if the Court accepted the adjustments as accurate, they have no more effect than to make clear that the property comparisons in this appraisal were not, in fact, comparable at all.[17]   This lack of parallel comparisons greatly undermined the Court's reliance on the value provided by the appraisal.

Furthermore, Ms. Odom testified that there were property sales available for comparison that were more similar to the subject property than those used in the appraisal report.  The first was a 2006 sale of an 80 acre tract of land for $50,000.00 per acre (Debtor Exhibit #9).  Ms. Odom's testimony revealed that this property was similar to Sunset Lake in both terrain and intended use.  The second was a 2006 sale of a 40 acre tract of land that sold for $18,350.00 per acre.  Much like the Sunset Lake property, this tract of land was purchased for the purpose of rural development and was the same distance from the City of Maumelle as Sunset Lake (Debtor Exhibit #10).  Additionally, Ms. Odom's testimony as to three other comparable property sales included a 1997 sale of a 27 acre tract for $14,700.00 per acre, which is now being marketed at $92,000.00 per acre (Debtor Exhibit #11); a 2004 sale of a 53 acre tract of land within one mile of the subject property that sold for $14,150.00 per acre (Debtor Exhibit #13); and a 2004 sale of a 20 acre tract of land that sold for $37,500.00 per acre (Debtor Exhibit #14).  While National Bank did point out several

---

[17]   Noticeably absent from the testimony was any attempt by National Bank to rebut the Debtor's evidentiary assault on the appraisal report.  National Bank chose not to call Mr. McIntosh as a rebuttal witness.

discrepancies between these comparison properties and the subject property, these dissimilarities were no more distinct than the comparison properties used in its own appraisal. The simple fact that these property comparisons were not reviewed in National Bank's appraisal undermines its reliability.

Finally, the amount that a person in the market today would offer for the property is certainly of tremendous influence to a value determination. At the hearing on this matter, the Debtor was able to present exactly that scenario to the Court. The Debtor has entered into a binding contract to sell 40 acres of the Sunset Lake acreage property at a price of approximately $13,333.00 per acre. If this amount were used to estimate the value, the value would be $1,679,958.00, which would leave nearly $400,000.00 in equity.[18] National Bank made much of the fact that one of the contract provisions allows the purchaser to get out of the contract for a period of 90 days without recourse. Certainly, the Court considered this clause in affording weight to the purchase agreement, but for the purpose of determining whether there is equity in the property, the offer as a whole far outweighed any detrimental significance attributable to this particular clause. While the Court cannot conclude from this evidence that there is actually $400,000.00 in equity in this property, at a minimum, the vast difference between the contract offer and the appraisal value makes it apparent that the appraisal undervalues the subject property.

Taking into account the Court's numerous concerns with regard to the accuracy and

---

[18]  $1,679,958.00 (Estimated Value) - $1,281,870.27 (Debt Balance) = $398,087.73 (Equity).

reliability of the appraisal, together with the countervailing evidence of value as presented by the Debtor, the Court finds that National Bank failed to meet its burden of proof that there is a lack of equity in the Sunset Lake property.

### *The Panther Mountain Estate  (The Lots)*

As established by the exhibits presented by National Bank, the total amount owed on the Panther Mountain lots at the time of filing was $689,442.11 (Creditor Exhibit #11).  The contract rate of interest on this loan is 8.75% (Creditor Exhibit #4).  As a result, the post-petition interest on this claim accrued at a rate of $149.78 per day (Creditor Exhibit #11).[19] Using these figures, the amount owed on the acreage debt at the time of the Motion for Relief hearing was approximately $739,917.97.[20]  Thus, the determination of equity turns on whether National Bank presented sufficient evidence to show that the value of the property was less than this amount.

National Bank's appraisal placed a value of $480,000.00 on the 17 unsold lots in the Panther Mountain subdivision.  The appraisal utilized the income capitalization approach to arrive at this result, as opposed to the sales comparison approach used in the Sunset Lake appraisal.  Under the income capitalization approach, value is calculated using a three-step

---

[19]  *See* footnote 13, *supra*, regarding the parties' post-trial briefs on the proper rate of interest.

[20]  This case was filed on September 20, 2009.  The final hearing on this matter took place on August 23, 2010, which is 337 days after the date of filing.  This results in $50,475.86 additional post-petition interest when calculated at the contract interest rate. [$689,442.11 (Balance at Filing) + $50,475.86 ($149.78/Day for 337 Days) = $739,917.97].

process.  The first step is similar in method to the sales comparison approach, wherein the property is compared to the sale of other similar properties in order to derive a comparable value for the subject property.

The second step, on the other hand, goes far afield of the sales comparison approach. In the second step, a prediction is made as to how long it will take for the properties to sell and the property sales are allotted throughout that time period as though sold at the value established in the first step.  The total sales for each year are added together to create a gross revenue for that year.  Then that gross revenue is reduced by the estimated costs and expenses of the sales for that year, leaving a net revenue amount.  Finally, in the third step, the appraiser reduces the net revenue by a discounted cash flow percentage.  The purpose of the third step is to account for the time value of money.[21] [22]

The appraiser's use of the income capitalization approach in this case was not well received.  To justify the use of the income capitalization approach, the appraiser testified that he could not have used the sales comparison approach unless he could have found, as a

---

[21]  Mr. McIntosh testified that the purpose of the discounted cash flow reduction was to account for both the time value of money and risk, but gave no explanation of what "risk" was being assessed. The Court limited its review to the purpose of accounting for the "time value of money" as this purpose was clearly explained in the appraisal report (Creditor Exhibit 16, p.37).

[22]  Although a detailed analysis of this calculation is made in the text, the following is a summary review of the calculation as it applied to the facts of this case.  First, the appraisal arrived at a value of $56,500.00 per lot.  The predicted gross revenue from the sale of the 17 lots at that value was $991,315.00.  This gross revenue was then reduced to a net revenue by subtracting out the sale expenses, totaling $95,565.00.  The remaining net revenue was then reduced by a discounted cash flow measure, in this case 24%, or $415,250.00. [$991,315.00 (Gross Revenue) - $95,565.00 (Expenses) - $415,250.00 (Discounted Cash Flow) = $480,500.00 (Value)].

comparison, the sale of an entire subdivision of lots similar to Panther Mountain. The appraiser testified that there were no such comparable sales available to him for review. The Court finds that this justification flies in the face of the rationale he utilized in the Sunset Lake appraisal, wherein he made extremely liberal adjustments to comparison property prices in order to effectuate a comparison.

Furthermore, the first step of the income capitalization approach requires the appraiser to make a value determination using a method of comparison that is nearly identical to the sales comparison approach. In this case, there were eight recently sold lots within the Panther Mountain subdivision that could have been used as comparable properties under a sales comparison approach.[23] Indeed, the appraiser used these lots to calculate the value figure in the first step of the income capitalization approach. As such, the Court finds that the appraiser's justification for not doing a sales comparison calculation lacks credibility. At a minimum, the appraiser should have prepared a valuation based on both appraisal methods.

Nonetheless, the application of the income capitalization approach itself failed to persuade the Court that the Panther Mountain property lacks equity. In the first step, the appraiser predicted a per-lot value of $56,500.00. The appraiser testified that to reach this

---

[23]  The Court notes that some of the lots were sold as far back as 2007. The Court accepted these as appropriate for use as sales comparisons because the appraiser used 2005 and 2006 sales comparisons in the Sunset Lake appraisal.

number he averaged the sales prices for the two most recent lot sales, Lot #14 and Lot #2.[24] This statement was erroneous. While the appraiser did make the determination by averaging two figures, it was not the two that he testified he had used.[25]

According to the appraisal report, the first figure was actually an average of numerous prior lot sales. The average included the sales of six of the previously sold lots, including the most recent lot sale, which was Lot #14.[26] The first figure average came to $61,167.00, which the appraiser rounded down to $61,000.00. Then the second figure was, as the appraiser testified, based solely on the sales price of Lot #14 in the amount of $52,000.00. The appraiser then averaged the first figure, $61,000.00, and the second figure, $52,000.00,

---

[24]  Lot #14 was sold on July 10, 2009, for $52,000.00. Lot #2 was sold on January 2, 2008, for $63,000.00. The appraiser noted that there was one sale closer in time, Lot #17, which sold on August 6, 2008, but he omitted this lot because the sale had no tax stamp to validate the sales price. The Court takes no issue with the exclusion of Lot #17 from the calculation.

[25]  It is important that the Court explain its astonishment at this error. It is not the substance of the error that is of consequence. Indeed, the calculation put forward by the appraiser's testimony reaches nearly the same result as the calculation in the appraisal report. The significance comes from the simple fact that the appraiser did not know, or at least could not explain, how he made the value determination in the first step. This is a crucial step in the ultimate value calculation and the appraiser grossly misstated the way he calculated it. More significantly, the appraiser went into inventive detail about why he selected these particular sales for the calculation. The Court deserves a clear and accurate explanation of the appraisal calculations. By so boldly committing himself to these erroneous assertions, the appraiser completely undermined any confidence the Court placed in his testimony.

[26] The calculation included the following lots: Lot #18-$62,000.00; Lot #15-$64,000.00; Lot #5-$63,000.00; Lot #19-$63,000.00; Lot #2-$63,000.00; Lot #14-$52,000.00. Two lots were specifically and expressly excluded. Lot #23, selling for $78,000.00, was excluded because it had a substantially larger number of acres than the other lots. Lot #17 was excluded because there was no tax stamp on the property to validate the sales price. The Court takes no issue with the exclusion of these two lots.

to arrive at a per lot value of $56,500.00.[27]

The Court finds this mathematical quagmire unpersuasive. No explanation was given in either the testimony or the appraisal report for the tremendous weight placed on the sales price of Lot #14 in this calculation. It is plausible that this unbalanced calculation was meant to account for the most recent market conditions. Under this theory, the average from the first figure could determine the sales price, and then the second figure, as the most recent sale, is given a larger weight because it would most accurately depict current market condition.

On the particular facts of this case, however, the formula fails to account for one crucial fact; the most recent lot sale, Lot #14, also happened to be the smallest of the previously sold lots. Lot #14 consists of only 1.07 acres, whereas the other lots have an average size of 1.73 acres.[28] Not surprisingly, Lot #14 sold for $10,000.00 less than any other lot. Certainly this difference in size should have been accounted for by some adjustment or other compensatory measure. Instead, the appraiser's formula places 58% of

---

[27] The preceding account of the first step calculation comes directly from the appraisal report. (Creditor Exhibit #15, p. 41). A summary of the calculation is as follows: The halfway point between $61,000.00 (average of the 6 selected lot sales) and $52,000.00 (most recent lot sale of Lot #14) equals $56,500.00 (per lot value).

[28] This average size includes only the lots that the appraiser used in his calculation. The two lots excluded in that calculation were substantially larger. If included they would have the effect of substantially increasing the average lot size.

the resulting value on the sale price of the smallest and lowest priced lot.[29]  Of course, this weighted calculation dramatically and disproportionately decreases the resulting value of all the lots.  Given the large variation in sizes of the different lots, the appraisal would have been more accurate, and persuasive, had it been calculated on a per-square-foot basis rather than a broad, per-lot basis.  The failure to account for these apparent defects severely undermines the credibility of the appraisal's determination of value.

Even if these complications with the per-lot value calculation are entirely disregarded, the remaining two steps of the income capitalization approach were too speculative and unreliable to be persuasive.  In the second step of the income capitalization approach, using the $56,500.00 value calculation from the first step, the appraisal predicts the properties will produce a gross revenue of $991,315.00.[30]  After deducting the costs and expenses predicted to be incurred in selling the lots, the appraisal predicts that an $895,750.00 net revenue will remain.  At this stage, the appraisal calculation would still allow for more than $100,000.00 in equity.  It is only after applying the discounted cash flow measure that the value is reduced to $480,000.00, less than half of the original gross revenue calculation.

Moreover, the discount rate calculation itself is unreliable.  The discounted cash flow

---

[29]  The lower sales price of Lot #14 is given 8% weight of the total value calculation when it is accounted for in the average of the first figure.  It is then given an additional 50% weight when the second figure, Lot #14, is averaged with the first figure.

[30]  This amount takes into account a small increase in land value over the predicted four-year sales period.

measure is cumulative, which causes the discount rate to increase substantially from year to year.  The appraisal estimates that it will take four years for all of the lots to sell.  As a result of the cumulative calculation, the discount rate increased from approximately 20% in Year #1 to nearly 58% in Year #4.[31]  With this in mind, it is certainly of no small consequence that the appraisal lumps a majority of the lot sales into the last two years of the prediction.  More specifically, the appraisal forecasts that two lots will sell in Year #1, three lots will sell in Year #2, and that six lots will sell in both Year #3 and Year #4.  This allotment back-loads the calculation to produce a drastically reduced overall value.  Had the appraisal predicted an equal distribution of lot sales across the four years, the value calculation would have been significantly higher.  The appraiser testified that he based this allotment on a review of recent sales of similar properties in the subject area, and the appraisal report stated that the allotment is based on "correspondence with knowledgeable market participants." (Creditor Exhibit #16).  But no evidence beyond these statements was offered as support.[32]

Furthermore, there is a 15 acre tract of land adjoining the lots that was not included in the appraisal.  When asked why this property was not included, the appraiser stated that he thought its value was insignificant, worth no more than $1,000.00 per acre.  The appraiser may have been correct that the $15,000.00 value that this property added to the overall

---

[31]   The discount rate applied to the sales revenues from each of the four years is as follows: Year #1: 20%; Year #2: 35%; Year #3: 48%; Year #4: 58%.

[32]   As stated earlier, the Court found the appraisal and supporting expert testimony to be unreliable in several important areas.  As a result, the Court is not inclined to rely on the conclusory opinions of the expert on this topic without some further evidentiary support.

32

calculation was not determinative; however, this decision was one that should have been left to the Court. The simple fact that the property, which had at least some value, was not included in the appraisal, raises the question of what other facts may not have been considered or were purposely excluded by the appraiser. This lingering question left serious concerns with the Court as to the thoroughness and reliability of the appraisal.

During its cross-examination of Ms. Odom, National Bank introduced an advertisement into evidence that promoted lot sales in the Maumelle area for $24,900.00 (Creditor Exhibit #20). This advertisement was for a foreclosure auction. The advertisement used baited language such as "2 DAYS ONLY" and "FIRST COME, FIRST SERVED," which is commonly associated with an attempt to draw in purchasers. Even more telling, Ms. Odom testified that the advertisement was only announcing that the bidding on the lots will start at $24,900.00, but that it made no guarantees that any lot would actually sell at that price. Furthermore, the lots referenced in the advertisement are only one-half acre lots. In her testimony, Gayle Odom pointed out that the Panther Mountain lots are more than twice that size, with many of them being substantially larger. Given these facts, the advertisement provided the Court with little clarity or influence as to the value of the properties.

Taking into account the Court's ample concerns with regard to the accuracy and reliability of the appraisal and other evidence presented by National Bank, the Court finds that National Bank failed to demonstrate by a preponderance of the evidence that the Debtor lacks equity in the property. Consequently, no analysis of the necessity of the property to an

effective reorganization is required.[33]

## II.      RELIEF FROM STAY PURSUANT TO 11 U.S.C. § 362(d)(1).

### A.      *Burden of Proof*

The burden of proof on a request for relief for cause, pursuant to 11 U.S.C. § 362(d)(1), is on the debtor. 11 U.S.C. § 362(g). This ultimate burden only exists, however, where adequate grounds for causal relief are first laid out by the moving party. *In re Layne*, 17 B.R. 140, 142 (Bankr. Ohio 1981) ("[The] Debtor is not responsible to rebut potential straw issues which are neither raised in the parties' pleadings nor implied in the Court record."). To sufficiently raise an issue of cause, the moving party must always bear an initial burden of establishing a *prima facie* case. *See In re Cambridge Woodbridge Apartments, L.L.C.*, 292 B.R. 832, 841 (Bankr. N.D. Ohio 2003). Once the initial burden of the *prima facie* case is satisfied, the burden of proof shifts to the debtor. § 362(g); *In re Anthem Cmty's/RBG, L.L.C.*, 267 B.R. 867, 871 (Bankr. D. Colo. 2001); *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).

---

[33] The Court notes that even though no finding is necessary on this point, sufficient evidence was presented for a determination that the property is necessary – it is the primary asset of the Debtor's estate. Furthermore, the Debtor presented the Court with a proposed plan of reorganization that would ensure that the properties are sold within a two-year time period, at the end of which any unsold lots would be offered at public auction. Given these facts, had the issue been ripe for determination, the Court would determine that there is a reasonable possibility of an effective reorganization.

B.    *Legal Standards*

The Court can grant relief from the automatic stay "for cause." 11 U.S.C. § 362(d)(1). Section 362(d)(1) prescribes that cause exists where there is a lack of adequate protection. *Id*. Although there is not an exclusive list of circumstances under which cause exists, adequate protection is the argument most commonly employed to justify such requests. *See United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 370-71, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988); *In re Mid-Atlantic Handling Systems, L.L.C.*, 304 B.R. 111, 130 (Bankr. D.N.J. 2003).

The concept of adequate protection is derived from the property interest protections found in the Fifth Amendment. U.S. Const. Amend. V; *In re Carson*, 34 B.R. 502, 505 (D. Kan. 1983); *In re Johnson*, 90 B.R. 973, 979 (Bankr. D. Minn. 1988).  The purpose of adequate protection is to guard the secured creditor's interest from a decline in the value of the collateralized property. *See* 11 U.S.C. § 361; *In re Anthem,* 267 B.R. at 871; *Timbers,* 484 U.S. at 370.  In exchange for providing protective assurances against a decline in property value, the debtor is allowed to retain the protections provided by the bankruptcy code. *Timbers*, 484 U.S. at 378 ("The debtor in process of reorganization . . . is given many temporary protections against the normal operation of the law.").

In order to establish a *prima facie* case of a lack of adequate protection, the moving party must provide evidence that the value of the collateralized property is declining, or at least threatened, as a result of the automatic stay. *In re Elmira Litho, Inc.,* 174 B.R. at 902;

35

*In re Kowalsky*, 235 B.R. 590, 595 (Bankr. E.D. Tex. 1999). The most direct and convincing proof that the value is "declining, or at least threatened" comes from a comparison of the property value at the time of the hearing to the property value on the date of filing. *In re Elmira Litho, Inc.*, 174 B.R. at 903. Nonetheless, the *prima facie* case requirement is met if the creditor presents evidence, in any form, that effectively demonstrates that its position in the collateral is in jeopardy. *In re Anthem,* 267 B.R. at 874 ("Future interest accruals, property taxes and mechanic's liens are relevant to the extent that they demonstrate a post-petition erosion of the creditor's secured claim."); *see also, e.g., In re Layne,* 17 B.R. at 142 (Bankr. Ohio 1981) ("increasing tax debts, interest accruals, potential sudden loss, and 'sour' market conditions"); *In re Kowalsky,* 235 B.R. at 596 (vehicle driven by debtors' teenage son); *In re Balco Equities Ltd, Inc.*, 312 B.R. 734 (Bankr. S.D.N.Y. 2004) ("wear and tear to the vessels").

Once the creditor evinces a decline in value, the debtor must either persuasively refute the evidence of the decline, or in the alternative, show that there are sufficient protections in place to guard against it. § 362(g); *In re Anthem*, 267 B.R. at 871; *Elmira Litho, Inc.*, 174 B.R. at 902-03. The methods of providing adequate protection fall broadly into one of the three following categories: cash payments, replacement liens, or any other form of protection that provides the creditor with the "indubitable equivalent" of its interest. *See* 11 U.S.C. § 361. The latter method opens the door to a boundless array of protective measures, the sufficiency of which must be determined on a case-by-case basis. *In re Asbridge*, 66 B.R.

894, 899 (Bankr. D.N.D. 1986); *In re Kowalsky*, 235 B.R. at 595 ("The determination of whether a creditor's interest is adequately protected is not an exact science nor does it involve a precise arithmetic computation."); *In re Layne*, 17 B.R. at 142 ("[T]he question of 'cause' is basically resolved by ad hoc factual determination.").

A list of commonly influential factors is easily derived from prior court decisions on this topic. Of these factors, the most prevalent include the sufficiency of the equity cushion, periodic payments, additional liens, or a good prospect of a successful reorganization. *In re Johnson,* 90 B.R. at 979; *In re Monroe Park*, 17 B.R. 934, 940-41 (D. Del. 1982); *In re Tucker*, 5 B.R. 180, 182-83 (Bankr. S.D.N.Y. 1980). By far the most determinative of these factors, however, is the existence of an equity cushion. *In re Johnson*, 90 B.R. at 979; *In re Belton Inns, Inc.*, 71 B.R. 811, 816 (Bankr. S.D. Iowa 1987) ("[T]he classic protection for a secured debt . . . is the existence of an 'equity cushion,' . . . ").

The "equity cushion" is a term of art defined as the amount by which the value of the collateral exceeds the liens – equity – which will operate as a shield to protect the creditor's interest – cushion – if the property value declines during the bankruptcy case. *In re Johnson*, 90 B.R. at 979; *In re Roane,* 8 B.R. 997, 1000 (Bankr. Pa. 1981). Whether the measure of the equity cushion is sufficient to provide adequate protection is ultimately decided on a case-by-case basis. *In re Tucker,* 5 B.R. at 183; *In re Curtis*, 9 B.R. 110, 112 (Bankr. Pa. 1981); *see also In re Trident Corp.,* 22 B.R. 491, 495-96 (Bankr. E.D. Pa. 1982) (nominal equity cushion one among many factors); *In re Keays*, 36 B.R. 1016, 1017 (Bankr. E.D. Pa. 1984)

(eroding equity cushion only one factor).

C.      *Analysis*

National Bank urges that it is entitled to relief for cause pursuant to 11 U.S.C. § 362(d)(1).  The only argument made by National Bank on this basis was lack of adequate protection.  National Bank presented very little evidence in support of this argument, but the Court finds it sufficient to establish a *prima facie* case.  Nevertheless, the persuasive value of this evidence was ultimately overpowered by the countervailing evidence presented by the Debtor on this issue.

### The Prima Facie Case

National Bank argues that it lacks adequate protection because there is an insufficient equity cushion to protect its claim.  Specifically, National Bank asserts that any existing equity cushion will be depleted, over the next two years, as interest continues to accrue on the claim.[34]  Standing on its own, this argument fails.  Even at a colossal interest rate, it is unlikely that the post-petition accrual of interest, on its own, could ever cause a lack of

---

[34]  The parties submitted post-trial briefs concerning the rate at which interest should accrue on National Bank's post-petition claim.  As explained in the text, *infra*, the facts and circumstances of this case warrant a finding of adequate protection regardless of whether any equity cushion exists.  As such, the rate at which the post-petition interest erodes the equity cushion is not determinative of the matter at hand.  Furthermore, the appropriate interest rate is an issue to be decided in connection with plan confirmation, particularly with respect to post-confirmation interest, and it is premature to make a ruling on the appropriate interest rate at this time.  The Court notes, however, that generally post-petition pre-confirmation interest accrues at the contract rate.  *See In re L.B. and Mary Louise Bryant*, 4:07-bk-15787, slip op. at 24 (Bankr. E.D. Ark. October 8, 2010).

38

adequate protection.

Post-petition interest accruals are only allowed to the extent of the value of the collateral. 11 U.S.C. § 506(a); *In re Lane*, 108 B.R. 6, 8 (Bankr. D. Mass. 1989). As such, post-petition interest accruals can have the effect of eroding the equity cushion, possibly even in its entirety, but can never actually impede the creditor's interest in the collateral. *In re Chauncy St. Assoc. Ltd. P'ship,* 107 B.R. 7, 8 (Bankr. D. Mass. 1989). Any argument to the contrary rebels against the fundamental and long-settled division of a creditor's secured and unsecured claims. *See In re Lane*, 108 B.R. at 8-9 ("If a creditor who is undersecured at the beginning of the case is nevertheless considered to have adequate protection, one who stands only to lose his equity cushion, largely through earning additional interest, hardly seems worse off.").

In order to supplement the deficiency in this argument, National Bank urges in its post-trial brief that there is a minimum equity cushion required in all adequate protection cases. In effect, National Bank's argument prescribes that the value of the collateral must exceed the liens by some minimum percentage before a claim of adequate protection can comfortably rest on the equity cushion. The Court declines to accept this broad suggestion. Instead, the Court recognizes that in many cases the bankruptcy courts have found the available equity cushion to be insufficient for the purpose of providing adequate protection.[35]

---

[35] *See, e.g., In re Helionetics, Inc.,* 70 B.R. 433, 440 (Bankr. C.D. Cal. 1987) (20% inadequate); *In re Palmer River Realty Inc.*, 26 B.R. 138, 141 (Bankr. D.R.I. 1983) ("at least a modest equity cushion required"); *In re Lake Tahoe Land Co., Inc.*, 5 B.R. 34, 37 (Bankr. Nev.

But it does not follow that even the most microscopic equity cushion would automatically fail to provide adequate protection if the chances of jeopardizing the creditor's interest were also *de minimis*. The sufficiency of the equity cushion must be evaluated on the facts of each individual case.

Despite the Court's rejection of National Bank's broad argument for a standard minimum equity cushion in all adequate protection cases, implicit within that argument is an allegation that an insufficient equity cushion exists on the particular facts of this case. This position combined with the evidence that the equity cushion is eroding due to the accrual of interest on National Bank's claim is sufficient to create a *prima facie* case for lack of adequate protection, and accordingly, the burden to prove the creditor is adequately protected shifts to the Debtor.

### The Equity Cushion and Other Factors of Adequate Protection

The sum of the evidence presented by National Bank on this issue included the testimony of National Bank's senior lender, Michael Fisher, and two exhibits prepared by him regarding the equity in the subject properties at the end of either a one or two-year period. This evidence established a plausible theory that, over time, the post-petition interest on National Bank's claims will cause the claims to increase by enough to erode any presently existing equity cushion.

_____

1980) (40% to 50% required); *In re Tucker,* 5 B.R. at 182 (7.4% inadequate).

However, the calculations of equity provided by these exhibits were based largely on the speculative outcome of yet undetermined events – the applicable rate of interest, the amounts taken out for real estate commissions, the amount taken out to fund the Debtor's plan, and the date on which the property sales will take place.  Mr. Fisher admitted in his testimony that the figures he had used in the calculation were not certain to result, but only represented one possible scenario.  This point is emphasized by a comparison to the similar, yet contradictory, calculations submitted by the Debtor (Debtor Exhibits #1-4).  In stark contrast, the Debtor's exhibits reached the result that at the end of either of the one or two-year periods, a sufficient equity cushion would remain to provide adequate protection.  These contradictory conclusions are a byproduct of the parties' manipulation of several flexible variables, with each party trending the variable toward the maxim that most obtained its desired result.  While the Court acknowledges that each party's calculation hypothesizes a plausible result, when viewed in contrast to one another it is clear that neither is largely determinative or persuasive of whether a sufficient equity cushion presently exists.

Nonetheless, the evidence provided by the Debtor on this matter was not limited to these exhibits.  Through the testimony of its witnesses, the Debtor was able to provide persuasive support that there is an adequate equity cushion.  Two different witnesses provided credible testimony on the value of the properties.  In her testimony, Ms. Kellerman stated her valuation of the Panther Mountain lots to be, at a minimum, $50,000.00 per lot. With regard to the Sunset Lake acreage property, Ms. Kellerman testified that the value was

around $15,000.00 per acre.  The real estate agent for the property, Ms. Odom, made very similar valuations in her testimony.  Ms. Odom stated that the Panther Mountain lots would likely sell in the range of $50,000.00 to $60,000.00, depending on the size variance of the lots, and that the Sunset Lake acreage property had a value of approximately $15,000.00 per acre.  Further, circumstantial support can be drawn for each of these estimates from the fact that contract price on the Sunset Lake acreage property is $13,333.00 per acre, just below the value as assessed by the Debtor's witnesses, and from the fact that the average sales price of the previously sold Panther Mountain lots is in excess of $60,000.00.

Furthermore, the Debtor's witnesses provided persuasive testimony that the value of the property is likely to continue to increase.  Both Ms. Kellerman and Ms. Odom are familiar with the subject properties and the real estate market in the Maumelle area.  Each testified that Maumelle has experienced continuous growth despite a recent period of general economic downturn.  In support of this contention, both witnesses referenced a new 65 million dollar school and three million dollar police station and fire station that are being built in the area.  Both Ms. Kellerman and Ms. Odom stated that these additions would likely increase interest in the area.  In rebuttal, National Bank pointed to the fact that none of the properties have sold in the last year despite the fact that the information on the new school and municipal facilities has been public during that time.  While the Court agrees that this fact reduced the weight of the testimony provided by the Debtor on this issue, it notes that there is presently a contract to sell a large portion of the Sunset Lake property, which to some

42

extent offsets this criticism.  Additionally, the Debtor's witnesses both testified that the sale of this portion of the Sunset Lake property itself would likely inspire interest in the remaining acreage.

Finally, despite the existence of an equity cushion, the Court finds that National Bank's interest is adequately protected.  The Court is convinced that part of the reason the subject properties have not sold is owed to a reduction in Ms. Odom's ability to market the properties due to family members' health complications and that action has been taken to compensate for this reduced marketing opportunity.  Ms. Odom testified that she has recently started an aggressive marketing campaign, consisting of printed materials, emails to registered builders in the area, and a mailing campaign.  Ms. Odom stated that this campaign was producing interest in the properties and that she currently is talking with six different purchasers about buying lots in Panther Mountain.  Ms. Odom stated that the marketing campaign has also produced interest in the Sunset Lake property.  Additionally, the Debtor provided the Court with good reason to believe that a plan will be confirmed in this case. The Debtor presented the Court with a proposed First Amended Plan of Reorganization.[36] In that plan, the Debtor placed deadlines on the sale of the properties so that if the properties are not sold within a two-year period they will be sold at a public auction.  This evidence was

---

[36] The proposed plan presented by the Debtor was not filed with the Court.  National Bank objected to this plan being entered into evidence as irrelevant.  The Court overruled the objection because the proposed plan had probative value that the Debtor was actively planning its reorganization, which will protect National Bank's interest in the property.

43

sufficient to convince the Court that adequate measures are being taken to sell this property as quickly and efficiently as possible, which will provide protection to National Bank.

Therefore, the Court has determined that there is an equity cushion in the properties sufficient to provide adequate protection in this case. Although there is some possibility that the equity cushion will deteriorate over time due to the accrual of post-petition interest, this deterioration will only work to impugn the equity cushion and will not actually impair National Bank's claim. Nonetheless, the evidence was sufficient to persuade the Court that the increase in property value over time, the likelihood that the Debtor's plan of reorganization will be confirmed, and the Debtor's approach to marketing these properties in order to effect an expedient sale are sufficient to ensure that National Bank's interest will remain adequately protected. Accordingly, the Court finds that no cause exists sufficient to warrant that National Bank receive relief from the automatic stay.

## III.   VALUATION OF SECURED CLAIMS PURSUANT TO RULE 3012.

### A.   *Burden of Proof*

The burden of proof on a request to value claims falls to the claimant. *In re Sneijder*, 407 B.R. 46, 55 (Bankr. S.D.N.Y. 2009); *In re Robertson*, 135 B.R. 350, 352 (Bankr. E.D. Ark. 1992). To make this showing, the claimant must demonstrate both the extent of its lien and the value of the collateral securing that lien. *Id.*

44

B.     *Legal Standard*

"The court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest . . .". Fed. R. Bankr. P. 3012. The analysis utilized to determine the value of a claim begins with § 506(a). A claim is secured "to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. § 506. In other words, a secured debt is generally divided into both a secured and unsecured claim, with the unsecured portion being any amount by which the debt exceeds the value of the collateral. *U.S. v. Ron Pair Enters., Inc.,* 489 U.S. 235, 238-40, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989).

C.     *Analysis*

To this point, the primary concern has been whether any equity exists in the subject properties; the Court has answered that quandary in the affirmative. Following the legal analysis outlined above, it is clear to the Court that the value of the secured claim lies somewhere below the equity threshold. The Court notes, however, that it is one thing to ask whether the equity dam is overflowing, but quite another to ask by how much. The concept of valuation requires quantitative evidence sufficient to make a particular numerical determination.

The Court is duty-bound to make extensive and often illusive determinations, assessments, evaluations, and calculations; but it is not permitted to guess. As discussed in

45

great detail in analyzing National Bank's requests for relief, the Court has not been presented with sufficient, reliable evidence from which it could derive a particular value of the property. Specifically, the appraisal report and testimony of Mr. McIntosh were materially flawed to an extent that they were unreliable. Little other evidence was provided by National Bank to support a value determination for the subject properties. National Bank had the burden of proof on these matters and failed to provide convincing evidence. As a result, the Motion for Valuation must be and is denied.

## CONCLUSION

In conclusion, National Bank failed to meet its burden of proof that there is no equity in the subject properties and, as a result, is not entitled to relief under § 362(d)(2). Similarly, based on the totality of the circumstances, and more specifically, because a sufficient equity cushion exists, the Court finds that National Bank is adequately protected. Consequently, National Bank is not entitled to relief under § 362(d)(1). Finally, the evidence was insufficient for the Court to determine the value of National Bank's secured claim. Accordingly, National Bank is not entitled to a value determination pursuant to Fed. R. Bankr. P. 3012.

For the reasons stated herein, it is hereby

**ORDERED** that the Motion for Relief and the Motion for Valuation are **DENIED**.

46

**IT IS SO ORDERED.**

Audrey R. Evans
United States Bankruptcy Judge
Dated:   10/22/2010


cc:    Charles Davidson and Stephen L. Gershner, Attorneys for Creditor

Richard L. Ramsey and James H. Penick , Attorneys for Debtors

U.S. Trustee

EOD 10/22/2010
by L Martindale

47